# EXHIBIT 1

| | |
|---|---|
| DISTRICT COURT, BOULDER COUNTY, COLORADO<br>Court Address:<br>Boulder County Combined Court<br>1777 6th Street<br>Boulder, CO 80302<br><br>Telephone:  (303) 441-3750<br>_____ | DATE FILED: January 31, 2020 4:07 PM<br>FILING ID: AE387380808C2<br>CASE NUMBER: 2020CV30109 |
| Plaintiff:<br><br>OREO VENTURES, INC., a Colorado corporation, formerly known as INGALLS ENGINEERING COMPANY, INCORPORATED, a Colorado corporation,<br><br>v.<br><br>Defendant:<br><br>RB DISTRIBUTION, INC., a Pennsylvania corporation<br>_____ | ▲ COURT USE ONLY ▲<br>_____<br><br>Case Number:<br><br>2020 CV _____<br><br>Ctrm: |
| Attorney for Plaintiff<br>Thomas C. Volkmann  #17659<br>SPIECKER, HANLON, GORMLEY & VOLKMANN, LLP<br>225 No. 5th Street, Suite 620<br>P. O. Box 1991<br>Grand Junction, Colorado 81502<br>Telephone:  (970) 243-1003<br>Fax:  (970) 243-1011<br>E-mail:  tom@shgvlaw.com | |
| **COMPLAINT FOR DECLARATORY RELIEF** | |

Plaintiff, OREO VENTURES, INC., a Colorado corporation formerly known as INGALLS ENGINEERING COMPANY, INCORPORATED (hereinafter "Plaintiff"), through its undersigned counsel, as and for its Complaint in this matter, hereby alleges as follows:

1

## **GENERAL ALLEGATIONS**

l. Plaintiff is a Colorado corporation whose principal place of business is 8688 Portico Lane, Longmont, Colorado 80503.

2. Upon information and belief, Defendant RB Distribution, Inc. ("Defendant"), is a Pennsylvania corporation doing business in Colorado whose principal business address is 3400 East Walnut Street, Colmar, Pennsylvania 18915.

3. On or about January 5, 2017, Plaintiff and Defendant entered into that certain Asset Purchase Agreement, a true and complete copy of which (without the exhibits referenced therein) is attached hereto as Exhibit "A", pursuant to which Defendant acquired substantially all of the assets of Plaintiff (the "Agreement").

4. As provided in Section 3.2 of the Agreement, part of the consideration payable to Plaintiff pursuant to the Agreement was earn-out payments.

5. The operative language of Section 3.2 of the Agreement is as follows:

3.2 Earn-out Payment.

 3.2.1 The (i) first fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "First Earn-out Payment Period"; (ii) second fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Second Earn-out Payment Period"; (iii) third fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Third Earn-out Payment Period"; (iv) fourth fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Fourth Earn-out Payment Period"; (v) fifth fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Fifth Earn-out Payment Period" (the First Earn-out Payment Period, the Second Earn-out Payment Period, the Third Earn-out Payment Period, the Fourth Earn-out Payment Period and Fifth Earn-out Payment Period each referred to as an "Earn-out Payment Period" and together referred to as the "Earn-out Payment Periods"). As set forth in this Section 3.2, as additional consideration for the Assets, with respect to the Earn-out Payment Periods, Company shall, subject to Buyer's right to setoff pursuant to Section 8, be entitled to aggregate payments (each payment an "Earn-out Payment" and collectively the "Earn-out Payments") of up to Four Million Dollars ($4,000,000) pursuant to this Section 3.2 (the "Ceiling"). At the request of the Company, any Earn-out Payments may be directed to Mr. John E. O'Rourke, *provided, however*, that for tax purposes, such Earn-out Payments shall be deemed to have been paid to the Company.

 (a) For each Earn-out Payment Period, the Company shall be entitled to receive from Buyer an Earn-out Payment for the applicable Earn-out Payment

2

Period(s) equal to four percent (4%) of such Incremental Net Sales up through and until the Ceiling has been met.

(b)     For the avoidance of doubt, the Company shall have no right to receive any additional Earn-out Payments above the Ceiling.

(c)     "Incremental Net Sales" For the First Earn-out Period, "Incremental Net Sales" shall mean the Net Sales minus $1,800,000.  For all other Earn-out Periods, "Incremental Net Sales" shall mean the Net Sales for the applicable Earn-out Period minus the Incremental Net Sales for the immediately preceding Earn-out Period. By way of example, if the Net Sales of the Company for the First Earn-out Period, are $5,000,000 and the Net Sales of the Company for the Second Earn-out Period are $8,000,000, then the Incremental Net Sales for the First Earn-Out Period would be the amount equal to $5,000,000 minus $1,800,000 and the Incremental Net Sales for the Second Earn-Out Period would be an amount equal to $8,000,000 minus the difference between $5,000,000 and $1,800,000.  Incremental Net Sales shall be determined by Buyer in consultation with John.

(d)     "Net Sales" shall mean the gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after Closing (the "Chassis Product Line"), less all adjustments, including discounts, allowances, rebates and product lifts for the Chassis Product Line, *provided, however*, that Net Sales shall not include any control arms, and shall not include any sales to AutoZone of products that are a part of the Chassis Product Line that are sold by Buyer or any affiliate of Buyer to AutoZone on the date hereof (such products, "Overlapping Products").  For the avoidance of doubt, a product shall be deemed to be an Overlapping Product if its part number (or successor part number) is the same as a part number (or successor part number) for a product that is sold by the Company to AutoZone immediately prior to Closing.

6.     Defendant paid Plaintiff an earn-out payment pursuant to the above provisions for calendar year 2017 and provided Plaintiff with certain information as to the basis for the calculation thereof.

7.     By written notice dated on or about March 25, 2019, Defendant provided Plaintiff with a report on the earn-out calculations for calendar year 2018, and informed Plaintiff that no earn-out payment was payable for that calendar year.

8.     Upon receipt of the information for calendar year 2018, Plaintiff inquired as to the total small box chassis part sales by Defendant and its affiliates for that year, and is informed and believes that such sales were far in excess of the sales figure used in calculating the earn-out payment to Plaintiff for 2018.

9.     Upon information and belief, Defendant calculated the 2017 and 2018 earn-out amounts based upon less than the total small box chassis part sales by Defendant and its affiliates

for those years, although the information provided with that 2017 payment and the 2018 notice was insufficient to allow Plaintiff to evaluate such calculations.

10. Upon receiving the earn-out information for calendar year 2018, Plaintiff timely submitted to Defendant an objection as to the small box chassis part sales totals upon which the earn-out report was based.

11. Through the course of several discussions thereafter, it is apparent that Defendant has calculated the Plaintiff's earn-out payments based upon sales totals of less than all "gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after the Closing" as required by Section 3.2(d) of the Agreement.

12. Although counsel to the parties have conferred on several occasions as to the apparent disagreement in the meaning and application of the operative earn-out language contained in the Agreement, they are unable to agree as to the meaning of, and resulting calculations pursuant to, the earn-out language in Section 3.2 of the Agreement.  Due to that disagreement, this action and the resolution sought is therefore necessary.

13. Only upon clarification and resolution of the existing dispute between the parties as to the meaning and calculations under Section 3.2 of the Agreement can the calculations and payments be made in accordance with that clarification and resolution.

14. Section 14 of the Agreement provides that the Agreement shall be construed and enforced  in accordance with the laws of the Commonwealth of Pennsylvania, and that the exclusive jurisdiction with respect to all claims and disputes between or among the parties to the Agreement shall be in the state and federal courts of the State of Colorado.

## FIRST CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

15. Plaintiff hereby incorporates paragraph 1 through 14 above as if fully set forth herein.

16. There exists a justiciable dispute between the parties as to their respective rights and obligations under the Agreement with regard to the calculation and payment of the earn-out consideration pursuant to the Agreement.

17. A declaratory adjudication is necessary in accordance with CRCP Rule 57 to determine and clarify the respective rights and obligations of the parties under the Agreement.

WHEREFORE, Plaintiff respectfully requests a judgment of the Court as follows:

(a)     Declaring the respective rights and obligations or the parties under the Agreement, including, without limitation, that the Plaintiff is entitled to earn-out payments in accordance with the terms and conditions of Section 3.2 of the Agreement calculated based upon "the gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after Closing" as provided in that provision and that Defendant is not authorized by any provision of the Agreement to exclude small box chassis part sales other than those expressly identified in Section 3.2(d) of the Agreement as so excluded;

(b)     For recovery of all costs and attorneys' fees to which the Plaintiff is entitled, to the fullest extent allowed by law and the Agreement; and

(c)     For such other relief as the Court may deem just and proper.

Dated this ____31st____ of January, 2020.

SPIECKER, HANLON, GORMLEY & VOLKMANN, LLP

By: _____/s/ Thomas C. Volkmann_____
       Thomas C. Volkmann
       Attorney for Plaintiff
       Oreo Ventures, Inc., formerly known as
       Ingalls Engineering Company, Incorporated

Address of Plaintiff:
8688 Portico Lane,
Longmont, Colorado 80503

**This document was filed via the ICCES E-file system.  The original signed copy is on file at the offices of Spiecker, Hanlon, Gormley & Volkmann, LLP, Grand Junction, CO.**

**DORMAN**
**NEW SINCE 1918**

DATE FILED: January 31, 2020 4:07 PM
FILING ID: AE387380808C2
CASE NUMBER: 2020CV30109

As of January 5, 2017

Mr. John E. O'Rourke
Ingalls Engineering Company, Inc.
2011 Cherry Street, #104
Louisville, CO 80027

Dear Mr. O'Rourke:

This letter purchase agreement (the "Agreement") is a legally binding agreement pursuant to which RB Distribution, Inc., a Pennsylvania corporation ("Buyer"), will purchase certain assets of Ingalls Engineering Company, Incorporated (the "Company"), which is owned by John E. O'Rourke ("John") "Shareholder" and, collectively, Company and Shareholder on the effective date hereof shall be referred to as "Seller"), upon the terms and subject to the conditions set forth below. Incorporating the foregoing herein, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  Sale; Assets.  Upon the terms and subject to the conditions set forth herein, on the Closing Date (as defined in Section 5), Seller shall sell, transfer, assign and convey unto Buyer, with good and marketable title, free and clear of all liens, security interests, liabilities, charges, disputes, claims, judgments and encumbrances of any kind or nature (collectively, "Encumbrances"), all of Seller's right, title and interest in and to certain inventory and equipment relating to Company's small box chassis line, certain Assigned Contracts (as defined below), good will and certain other rights, property and assets, all as set forth on Schedule 1 hereto (collectively, the "Assets"). The Assets shall not include and shall specifically exclude any cash and cash equivalents, contracts or agreements of Company except the Assigned Contracts, and all accounts and notes receivables. For purposes of this Agreement, "Assigned Contracts" shall mean all contracts and agreements of Seller (whether or not Seller has received consent of the other party or parties thereto for the assignment of such agreement or contract to Buyer) set forth on Schedule 1 hereto.

2.  Liabilities.  Except for operating liabilities of Company set forth on Schedule 2 hereto (the "Assumed Liabilities"), Buyer will not assume and shall in no event be liable for any debts, liabilities, obligations or responsibilities of any kind whatsoever of Seller, the Business (as defined in below) and/or relating to the Assets, whether direct, indirect, recorded, unrecorded, accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due, all of which shall remain the sole obligations of Seller, including, without limitation, any liabilities, obligations or responsibilities of any kind relating to the non-operating liabilities, interest-bearing indebtedness, taxes (or liabilities related thereto) of Seller relating to the Business, the Assets or the Assumed Liabilities for any pre-Closing tax period, taxes that arise out of the consummation of the transactions contemplated hereby or other taxes of Seller of any kind or description that become a liability or obligation of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or law, marketing and advertising costs, compensation to employees, agents or others, employee benefit plan amounts, amounts relating to regulatory matters and/or any Orders and/or Proceedings (as each is defined in Section 4). For the avoidance of doubt, Buyer shall not assume any liabilities or obligations in respect of the Assigned Contracts unless such liabilities or obligations are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform,



**EXHIBIT**

A

_____

improper performance, warranty or other breach, default or violation by Seller at or prior to the Closing. Nothing in this Agreement shall be construed as an attempt to assign any contract intended to be included in the Assets that by its terms is non-assignable without the consent of the other party or parties thereto unless such consent shall have been given.  Seller shall, at the request and under the direction of Buyer, take all reasonable actions (including the appointment of Buyer as attorney-in-fact for Seller) and do or cause to be done all such things as shall in the reasonable judgment of Buyer be necessary or proper (a) to assure that the rights and benefits of Company under such contracts shall be preserved for the benefit of Buyer and (b) to facilitate receipt of the consideration to be received by Company in and under such contracts, which consideration shall be held for the benefit of, and shall be delivered to, Buyer. "Business" as used herein means Seller's business of designing, importing, engineering, selling and promoting small box chassis products in the United States, Canada and Puerto Rico; *provided* that the term "Business" as used herein in reference to time periods following the Closing shall mean the Buyer's operation of the Business following the Closing.

3.    Purchase Price.

3.1    Consideration.  The total purchase price for the Assets (the "Purchase Price") (the assumption of the Assumed Liabilities by Buyer in accordance with Section 2 shall serve as additional consideration for the Assets) shall be (a) Three Million One Hundred Twenty-six Thousand Six Hundred Ninety-seven and 46/100 Dollars ($3,126,697.46) (the "Base Price") plus (b) the Earn-out Payments (as defined in Section 3.2), if any.  At Closing, Buyer shall pay the Base Price, minus (i) the amount of Two Hundred Thousand Dollars ($200,000) (the "Holdback Amount"), which Holdback Amount may be used to satisfy any indemnification claims of Buyer pursuant to Section 8 below and which shall be released in accordance with Section 3.3 below, minus (ii) to the extent applicable, any and all indebtedness (including any prepayment premiums, fees or expenses) related to the Encumbrances listed on Schedule 4.2 (which shall be paid by Buyer on the date hereof to pay off such indebtedness in accordance with payoff letters executed by each lender, or other payee, of such indebtedness provided by Company to Buyer, with each payoff letter indicating the amount required to fully discharge such indebtedness and in form and substance reasonably acceptable to Buyer), minus (iii) to the extent applicable and as directed by Company, the aggregate amount of all fees, costs, charges, expenses and obligations incurred by Company to be paid in connection with or relating to the preparation for, and consummation of, this Agreement and the transactions contemplated hereunder pertaining to time periods on or prior to the Closing to the extent not paid prior to the Closing, in each instance, by wire transfer in immediately available funds to account(s) designated by Company.

3.2  Earn-out Payment.

3.2.1    The (i) first fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "First Earn-out Payment Period"; (ii) second fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Second Earn-out Payment Period"; (iii) third fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Third Earn-out Payment Period"; (iv) fourth fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Fourth Earn-out Payment Period"; (v) fifth fifty-two (52) full calendar weeks following the Closing Date shall be referred to as the "Fifth Earn-out Payment Period" (the First Earn-out Payment Period, the Second Earn-out Payment Period, the Third Earn-out Payment Period, the Fourth Earn-out Payment Period and Fifth Earn-out Payment Period each referred to as an "Earn-out Payment Period" and together referred to as the "Earn-out Payment Periods").  As set forth in this Section 3.2, as additional consideration for the Assets, with respect to the Earn-out Payment Periods, Company shall, subject to Buyer's right to setoff pursuant to Section 8, be entitled to aggregate payments (each payment an "Earn-out Payment" and collectively the "Earn-out Payments") of up to Four Million Dollars ($4,000,000) pursuant to this Section 3.2 (the "Ceiling").  At the request of the Company, any Earn-out Payments may

Page 3

be directed to Mr. John E. O'Rourke, *provided, however*, that for tax purposes, such Earn-out Payments shall be deemed to have been paid to the Company.

(a)     For each Earn-out Payment Period, the Company shall be entitled to receive from Buyer an Earn-out Payment for the applicable Earn-out Payment Period(s) equal to four percent (4%) of such Incremental Net Sales up through and until the Ceiling has been met.

(b)     For the avoidance of doubt, the Company shall have no right to receive any additional Earn-out Payments above the Ceiling.

(c)     "<u>Incremental Net Sales</u>" For the First Earn-out Period, "Incremental Net Sales" shall mean the Net Sales <u>minus</u> $1,800,000. For all other Earn-out Periods, "Incremental Net Sales" shall mean the Net Sales for the applicable Earn-out Period <u>minus</u> the Incremental Net Sales for the immediately preceding Earn-out Period. By way of example, if the Net Sales of the Company for the First Earn-out Period, are $5,000,000 and the Net Sales of the Company for the Second Earn-out Period are $8,000,000, then the Incremental Net Sales for the First Earn-Out Period would be the amount equal to $5,000,000 <u>minus</u> $1,800,000 and the Incremental Net Sales for the Second Earn-Out Period would be an amount equal to $8,000,000 <u>minus</u> the difference between $5,000,000 and $1,800,000. Incremental Net Sales shall be determined by Buyer in consultation with John.

(d)     "<u>Net Sales</u>" shall mean the gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after Closing (the "<u>Chassis Product Line</u>"), less all adjustments, including discounts, allowances, rebates and product lifts for the Chassis Product Line, *provided, however*, that Net Sales shall not include any control arms, and shall not include any sales to AutoZone of products that are a part of the Chassis Product Line that are sold by Buyer or any affiliate of Buyer to AutoZone on the date hereof (such products, "<u>Overlapping Products</u>"). For the avoidance of doubt, a product shall be deemed to be an Overlapping Product if its part number (or successor part number) is the same as a part number (or successor part number) for a product that is sold by the Company to AutoZone immediately prior to Closing.

3.2.2    Within forty-five (45) calendar days following the end of any Earn-out Payment Period, Buyer shall provide to Company its calculation of the Earn-out Payment together with reasonable supporting documentation for Buyer's calculation of such Earn-out Payment. Company shall have fifteen (15) calendar days following Buyer's delivery of such calculation to provide Buyer with a written notice (any such notice, an "<u>Earn-out Objection Notice</u>") stating in reasonable detail Company's objection to Buyer's calculation of the Earn-out Payment. Buyer agrees to cooperate with Company with regard to Company's review of the Buyer's Earn-out calculation including, without limitation, the making of Buyer's books, records, and personnel related to such calculation reasonably available to Company upon request. Following Buyer's receipt of any Earn-out Objection Notice, Company and Buyer shall attempt to negotiate in good faith to resolve such dispute. In the event that Company and Buyer fail to agree on any of Company's proposed adjustments set forth in the Earn-out Objection Notice within fifteen (15) calendar days after Buyer receives the Earn-out Objection Notice, Company and Buyer agree that a mutually acceptable independent accounting firm of nationally or regionally recognized standing (the "<u>Accounting Arbitrator</u>") shall, within the thirty (30) day period immediately following such failure to agree, make its calculation of the Earn-out Payment in dispute in accordance with the terms of this Agreement. Company and Buyer each shall provide the Accounting Arbitrator with their respective calculations of the applicable Earn-out Payment together with reasonable supporting documentation for such calculation (which documentation shall also be shared with the other party). The Accounting Arbitrator shall make its calculation of such Earn-out Payment in accordance with this Section 3.2 (the "<u>Accountant Calculation of Earn-out Payment</u>") and the Earn-out Payment calculation of Company or Buyer which is closer to the Accountant Calculation of Earn-out Payment shall be deemed to be the Earn-

Page 4

out Payment and shall be final and binding on Company and Buyer. The scope of the dispute to be resolved by the Accounting Arbitrator shall be limited to objections of Company in the Earn-out Objection Notice. The Accounting Arbitrator shall make its calculation based solely on presentations and supporting material provided by the parties and not pursuant to any independent review. The fees, costs and expenses of the Accounting Arbitrator shall be paid by the party whose calculation of the Earn-out Payment was different by the greater amount from that of the Accountant Calculation of Earn-out Payment. For purposes of this Section 3.2.2, in the event that the Company is no longer in existence, John shall have the right to exercise the rights of the Company under this Section 3.2.2.

3.2.3   If an Earn-out Payment is due and payable to Company pursuant to the terms of this Section 3.2, such Earn-out Payment shall be paid to Company (or its designee) within forty-five (45) days after the Buyer has completed its annual financial audit for the calendar year in which the Earn-out Payment Period occurred, but in no event later than March 15th of the immediately following year, by wire transfer of immediately available funds *provided, however*, if Company delivers an Earn-out Objection Notice, then the amount of any Earn-out Payment subject to dispute shall be withheld and, if such disputed amount is finally determined to be payable to Company in accordance with Section 3.2.2, Buyer shall pay such amount within ten (10) business days following the resolution of Company's objections set forth in the Earn-out Objection Notice in accordance with Section 3.2.2. Subsequent to the Closing, subject to Section 3.2.4 below, Buyer shall have sole discretion with regard to all matters relating to the operation of the Business. The parties hereto understand and agree that (i) the contingent rights to receive an Earn-out Payment shall not be represented by any form of certificate or other instrument, are not guaranteed or secured in any fashion, are not transferable and do not constitute an equity or ownership interest in Buyer, (ii) Seller shall not have any rights as a securityholder of Buyer as a result of Seller's contingent right to receive an Earn-out Payment hereunder, and (iii) no interest is payable with respect to an Earn-out Payment.

3.2.4   The Parties contemplate a program to market the Chassis Product Line, as and to the extent commercially viable, for a period of no less than the five (5) years of the Earn-out Period, with the expectation that both Parties will have the opportunity to benefit from that program. In addition, both Buyer and Company acknowledge that an increase in the Net Sales will be required in order for all or a portion of the Earn-out to be payable. Therefore, although subsequent to the Closing, Buyer shall otherwise have sole discretion with regard to all matters relating to the operation of the Chassis Product Line; Buyer agrees that: (a) Buyer shall not, directly or indirectly, take any actions in bad faith that would have the purpose of avoiding or reducing any Earn-out Payment hereunder, and (b) except as Buyer and Company may otherwise agree in writing, Buyer shall, and shall cause its Affiliates and their respective officers, managers and employees to, use commercially reasonable efforts to (x) operate the Chassis Product Line at all times during the Earn-out Payment Period in an economically and commercially rational manner consistent with Buyer's reasonable business practices and operating standards applicable to other product lines and divisions (including with respect to capital expenditures), and (y) conduct substantially all business and operations of Buyer and its Affiliates primarily relating to the Chassis Product Line so as to have the Net Sales included in the calculation of the Earn-out Payments in accordance with the terms of this Agreement.

3.3   Holdback Amount. To the extent available, the Holdback Amount shall be released by Buyer to the Company (or its designee(s)) on the fifteen (15) month anniversary of the Closing, *provided, however* that the amount of the Holdback released on such anniversary date shall be reduced by, to the extent applicable, (i) any finally agreed to or adjudicated indemnification claims of Buyer that remain unpaid at such time and (ii) the amount of any outstanding indemnity claims of Buyer. Any unreleased portion of the Holdback Amount retained pursuant to the immediately preceding sentence shall be released to Company (a) as mutually agreed to by Company and Buyer in writing or (b) as directed pursuant to a final and non-appealable court order from a court of competent jurisdiction. For the

Page 5

avoidance of doubt, any unreleased portion of the Holdback Amount not owing to Company shall be deemed a reduction in the Purchase Price.

3.4    Purchase Price Allocation.  The Purchase Price shall be allocated among the Assets in accordance with the Purchase Price Allocation Statement, which Buyer shall prepare in consultation with the Company and deliver to the Company promptly after the Closing.  All federal, state, local and foreign income tax returns of Buyer and Company shall be filed consistently with the information set forth on the Allocation Statement.   Moreover, Buyer and Company further agree to file Internal Revenue Service Form 8594 (and any corresponding form required to be filed by a state or local law) in a manner that is consistent with the information on the Allocation Statement.  Buyer and Company agree to promptly provide each other with any information necessary to complete such tax returns and Internal Revenue Service Form 8594 (and any corresponding form required to be filed by a state or local governmental tax authority).  Company and Buyer shall not take any position on a tax return, tax Proceeding or audit that is inconsistent with any information set forth on the Allocation Statement except to the extent required otherwise by applicable law.  Company and Buyer shall file one or more additional IRS Form 8594s (and any corresponding form required to be filed by a state or local government tax authority) in order to report any payments pursuant to the provisions of Section 3.2.

4.      Representations and Warranties.  Company and Shareholder, jointly and severally, represents and warrants to Buyer, as of the date hereof, as follows.  As used herein, "Subsidiary" of any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or other entity (collectively, a "Person") means any other Person (a) more than 50% of whose outstanding shares or securities representing the right to vote for the election of directors or other managing authority of such Person are, now or hereafter, owned or controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or control exists, or (b) which does not have outstanding shares or securities with such right to vote, as may be the case in a partnership, joint venture or unincorporated association, but more than 50% of whose ownership interest representing the right to make the decisions for such other Person is, now or hereafter, owned or controlled, directly or indirectly, by such first Person, but such other Person shall be deemed to be a Subsidiary only so long as such ownership or control exists. "Knowledge" shall mean the actual knowledge of the Party making the representation, without independent investigation, but including all knowledge obtained during the diligence performed in connection with this transaction.

4.1    Organization; Capitalization; Authority.

4.1.1    Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado with full corporate power and authority to conduct its business as it is now being conducted, to own and use the properties and assets that it purports to own or use, including the Assets, and to perform all of its obligations under the contracts to which such Company is a party or by which it is bound. Company has no Subsidiaries (as defined above) and does not own any shares of capital stock or other securities of any other Person (as defined below), except as set forth on Schedule 4.1.1.  Shareholder owns all of the issued and outstanding equity of Company and no Person has any options, warrants, claims or other rights to, or in connection with, the capital stock of Company or the Assets.  The books of account and other financial records of Company, all of which have been made available to Buyer, are true, complete and correct in all material respects and have been maintained in accordance with sound business practices.

4.1.2    The execution, delivery and performance of this Agreement (a) constitutes the valid and legally binding agreement of Shareholder and the Company, enforceable in accordance with its terms, (b) does not constitute a default, breach, violation or termination under any

contract, instrument or other document to which Company (and/or the Assets and/or the Business) is a party or is bound, including Company's organizational documents, (c) does not constitute a violation of any law, (d) does not give any Person the right to challenge any of the transactions contemplated hereby and (e) does and will not result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.  Shareholder has the legal right, power, capacity and authority to enter into this Agreement and all agreements, instruments and documents executed in connection herewith to which they are a party and to perform their obligations hereunder and thereunder.  Company has the requisite power and authority to enter into this Agreement and all agreements, instruments and documents executed in connection herewith and to perform its obligations hereunder and thereunder and all corporate action on the part of Company, its officers, directors and the Shareholder necessary for the due authorization, execution, delivery and performance of this Agreement and all agreements, instruments and documents executed in connection herewith to which it is a party has been taken.

4.2    Assets.  Except as set forth on Schedule 4.2, Seller has good and marketable title free and clear of all Encumbrances to the Assets and the Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing, and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted, all tangible personal property included in the Assets is structurally sound, in good operation condition and repair, adequate for the uses to which it is being put, and none of such tangible personal property is in need of maintenance or repairs, except for ordinary, routine maintenance and repairs that are not material in nature or cost.

4.3    Compliance with Law.

4.3.1    Company and the operation of the Business are, and have been, in compliance with all laws, including all tax and environmental laws excepting any violations or failures to comply that are not expected to result in any change or effect that is materially adverse to the Buyer's ownership and use of the Assets, or the results, operations or financial condition of the Business. Company has (a) timely filed all tax returns required to be filed by it; (b) paid all taxes owed (whether or not shown on a tax return) and remitted all payroll, sales and other withholding taxes to the applicable taxing authority; (c) not been the subject of any past or current audit related to taxes; (d) not received notice from any jurisdiction that it does not file tax returns or that it is subject to tax in such jurisdiction and (e) no liability for the taxes of any other Person as a transferee, successor, by contract or otherwise. None of Company's assets or the Business are subject to any outstanding order, writ, injunction, ruling, citation, award, decree, assessment or other judgment of any nature by or with any court, tribunal, arbitrator, or other governmental authority (collectively, "Orders").  Except as set forth on Schedule 4.3.1, there are no demands, claims, suits, actions, litigation, investigations, arbitrations, administrative hearings or any other proceedings of any nature (collectively, "Proceedings") involving or relating to the Business and/or the Assets, and no Proceeding is pending or threatened

4.3.2    Without in any manner limiting any of the other representations and warranties set forth in this Agreement, (a) to the Knowledge of the Company, none of Company, the Business or Company's facilities is in violation of, or has violated, or has been or is in non-compliance with, any environmental laws, including in connection with the ownership, use, maintenance or operation of, or conduct of the Business, Company, the Assets or any of Company's facilities, (b) Company has in place all permits, authorizations, certifications and approvals required by all applicable law, including all applicable environmental laws, which are each in good standing and Company and the Business are and have been in compliance with all terms and conditions thereof and all renewals therefor have been applied for, (c) Company has not received notice of any violations, obligations or liabilities arising under environmental laws, (d) there have been no releases or threatened releases of Hazardous Materials (as defined below) at or from any property owned, leased, used or occupied by Company or from property to

which Company has transported or arranged for transport for the treatment, storage, handling or disposal, of Hazardous Materials, (e) there are no pending or threatened Proceedings arising under environmental laws that have been or may be filed by any Person with respect to any property owned, leased, used or occupied by Company or the conduct of the Business and there are no conditions or circumstances associated with any currently or previously owned, leased, used or occupied properties or operations of Company, the Business or its current or former Subsidiaries or predecessors in interest that may give rise to any obligation or liability, and (f) no Hazardous Materials have been released at, on, under or from any property owned, leased, used or occupied by Company in violation of or requiring investigation or remediation under any environmental laws or related safety requirements and no underground storage tanks are or have been located at any property owned, leased, used or occupied by Company.  As used herein, "Hazardous Material" means any substance, waste, contaminant, pollutant or material that has been determined by any governmental authority to be capable of posing a risk of injury or damage to health, safety, property or the environment including (a) all substances, wastes, contaminants, pollutants and materials defined, designated or regulated as hazardous, dangerous or toxic pursuant to any law, and (b) asbestos, polychlorinated biphenyls, petroleum, petroleum products, urea formaldehyde and mold.

4.4     Customers; Suppliers; Contracts.   Company has no liability except for liabilities reflected or reserved against on Company's books of account and current liabilities incurred in the ordinary course of business since the date of such books.  All of the contracts, including all real property leases, that are included as a part of the Assets are all in full force and effect, and are not subject to early termination; and all parties to such contracts are in compliance with such contracts and are not in breach or default thereunder; and none of such contracts require the consent or approval of any party and/or governmental authority in connection with the transactions contemplated hereunder.   No suppliers, customers or consultants necessary to the performance of services to Company has given any notice or indication (written or oral) of its intention to terminate and/or modify or amend its relationship with the Business or Company, and the Business, John, and Company are on good terms with all such suppliers, customers and consultants.  Schedule 4.4 sets forth a true, correct and complete list of all customers of Company during the fiscal year ended December 31, 2015 and the eleven month period ended November 30, 2016.

4.5     Financial Statements.  Schedule 4.5 sets forth the unaudited, internally generated balance sheets of Company as of September 30, 2015, September 30, 2016, and December 31, 2016, and the related unaudited, internally generated, statements of income, shareholders' equity and cash flows for the periods then ended, and such financial statements (including the notes thereto, if any) are in accordance with the books and records of Company, present fairly in all material respects the financial condition of Company as of the respective dates indicated and, for the results of operations, shareholders' equity and cash flows, the respective periods covered thereby.

4.6     Employee Benefits; Insurance.  Company has no "employee benefit plans" as defined by Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, and all rulings and regulations promulgated thereunder; except as set forth on Schedule 4.6 Company has no agreement or other arrangement for the payment of any bonus, success fee, severance payment, change of control payment or other amount payable to any Person resulting from the consummation of the transactions contemplated by this Agreement.  Except as set forth on Schedule 4.6, Company has no written agreements relating to any employment or consulting relationship with any Person.  No Shareholder nor, to the Knowledge of the Company, any employee, consultant or contractor of Company is bound by any contract that purports to limit the ability of such Shareholder or such employee, consultant or contractor (a) to engage in or continue or perform any conduct, activity, duties or practice relating to the Business or (b) to assign to Company or to any other Person any rights to any invention, improvement or discovery.  Company has delivered to Buyer accurate and complete copies of all insurance policies to which Company is a party, which such insurance policies are valid, outstanding and

Page 8

enforceable, are issued by an insurer that is financially sound and reputable, provide adequate insurance coverage for the Assets and the Business and are sufficient for compliance with all laws.

        4.7        <u>Intellectual Property</u>.

        4.7.1    Schedule 4.7.1(i) contains a complete and accurate list of all Patents, Trademarks and Copyrights owned, licensed or used by the Company, other than licenses or agreements arising from the license or purchase of off the shelf software, including a complete and accurate list of all licenses, sublicenses, agreements or other rights granted or assigned by any third party to the Company. The Parties acknowledge and agree that the Company's brake patent, (Patent # 7,111,710 B2), and all rights thereunder are not included in the Company Intellectual Property being transferred to Buyer pursuant to this Agreement. The Company Intellectual Property constitutes all of the Intellectual Property which has been used by the Company for the Business as currently conducted. The Company owns, or possesses sufficient legal rights to use, all of the Company Intellectual Property free and clear of all Liens or claims of others (except for the rights of licensors with respect to any licensed Company Intellectual Property). Except as set forth on Schedule 4.7.2(ii), the Company has not licensed any Company Intellectual Property to or from any third party other than licenses of off the shelf software.

        4.7.2    The Company has not received any notice or claim challenging the complete possession of its rights to use the Company Intellectual Property or asserting that any other Person has any claim of legal or beneficial ownership with respect to Company Intellectual Property owned by the Company. Similarly, the Company has not received any notice challenging, terminating, amending, or affecting the interest of the Company in the Company Intellectual Property. To the Knowledge of the Company, the Company has taken all reasonable actions to maintain and protect the Company Intellectual Property that it owns, licenses or uses, including, if and when applicable and required, the secrecy or confidentiality thereof, which action may be taken by the Company and the Company Intellectual Property is currently in compliance with all applicable legal requirements necessary to protect the Company Intellectual Property. Furthermore, to the Knowledge of the Company, owners of any Intellectual Property licensed to the Company have taken all desirable actions to maintain and protect the Intellectual Property Rights that are the subject of such licenses. With respect to Trade Secrets, the documentation relating to each such Trade Secret, has been memorialized in writing, is accurate and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

        4.7.3    The operation of the Business does not, to the Knowledge of the Company, infringe, dilute, or otherwise violate the Intellectual Property rights of any Person, nor has the Company received any written notice alleging, nor does the Company have any Knowledge that it has violated or, by conducting its Business as currently conducted or proposed to be conducted, would violate any of the Intellectual Property rights of any other Person. The Company has not received any written notice of a claim nor does the Company have any Knowledge that any of the Company Intellectual Property is invalid, unenforceable, or misused. To the Knowledge of the Company, Company and the Business have the unconditional and unencumbered right to use (through Company's sole ownership), to the extent not already registered, the Company's Trademarks. No third party has been put on notice of, nor does the Company have Knowledge that a third party has, will be, or currently is infringing, misappropriating or otherwise misusing any of the Company Intellectual Property that is owned by the Company or, to the Knowledge of the Company, Company Intellectual Property owned by a third party.

        4.7.4    For purposes of this Agreement, (i) "<u>Patents</u>" means rights arising from or in respect to patents and patent applications, including continuation, divisional, continuation-in-part, reissue or reexamination patent applications and patents issuing therefrom, patent disclosures and inventions, draft patent applications and foreign versions of the foregoing whether protected, created or

arising under the Laws of the United States or any other jurisdiction; (ii) "Trademarks" means rights arising from or in respect to trademarks, service marks, trade names, logos internet domain names and corporate names (whether registered or unregistered, including any applications for registration of the foregoing), trade dress rights and general intangibles of a like nature, industrial or product designs together with all of the goodwill associated therewith, and foreign versions of the foregoing whether protected, created or arising under the Laws of the United States or any other jurisdiction; "Copyrights" means rights arising from or in respect to copyrights and copyrightable works and registrations, applications and renewals for registration thereof, mask works and registrations and applications for registration or renewals thereof, computer software, data, databases and documentation including copies and tangible embodiments (in whatever form or medium) thereof whether protected, created or arising under the Laws of the United States or any other jurisdiction and (iv), "Trade Secrets" means rights arising from or in respect to trade secrets and other confidential information (including, without limitation, ideas, formulas, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, concepts, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, financial and marketing plans and customer and supplier lists and information whether protected, created or arising under the Laws of the United States or any other jurisdiction. Patents, Trademarks, Copyrights and Trade Secrets are referred to collectively as "Intellectual Property". All of the Intellectual Property currently owned, licensed or used by the Company is referred to as the "Company Intellectual Property".

4.7.5   Company and the Business have the unconditional and unencumbered right to use (through Company's sole ownership), and allow Buyer to use and register (pursuant to the terms set forth herein), Company's name and trade names and all related common law and/or registered trademarks, service marks and trade names related thereto (collectively, the "Name Rights"). There has been no infringement by any other Person of any of the Name Rights or of any other intellectual property rights of Company. There is no claim or demand of any Person pertaining to, or any Proceeding which is pending or, to the Knowledge of Company, threatened, that challenges the rights of Company in respect of any Name Rights or other intellectual property rights. All registered intellectual property owned by Company is set forth on Schedule 4.7.

4.8   Other.   Except as set forth on Schedule 4.8, there are no contracts or agreements of any nature between or among the Company, on the one hand, and any current or former direct or indirect equityholder, director, officer, controlling Person or employee or consultant of the Company or any other Person affiliated with the Company or any family member thereof, on the other hand. Neither Company nor John has incurred any obligations or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the sale of the Assets. All inventory items included in the Assets consist of a quality and quantity usable in the ordinary course of business. Company is not now insolvent and will not be rendered insolvent by any transactions contemplated hereby and, immediately after giving effect to the transactions contemplated hereby, Company will be able to pay liabilities as they become due in the ordinary course of business. No representation, warranty or other statement made hereunder in connection with the transactions contemplated hereby contains any untrue statement or omits to state a material fact necessary to make any of them, in light or the circumstances in which it was made, not misleading. Neither John nor Company is aware of any fact that may materially adversely affect the Assets or the Business that has not been set forth in this Agreement.

5.   Representations and Warranties of Buyer – Buyer represents and warrants to Buyer, as of the date hereof, as follows.

5.1   Buyer is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania with full corporate power and authority to conduct

Page 10

its business as it is now being conducted, to own and use the properties and assets that it purports to own or use, including the acquisition of the Assets contemplated herein, and to perform all of its obligations under the contracts to which Buyer is a party or by which it is bound.

5.2     The execution, delivery and performance of this Agreement (a) constitutes the valid and legally binding agreement of Buyer, enforceable in accordance with its terms, (b) does not constitute a default, breach, violation or termination under any contract, instrument or other document to which Buyer is a party or is bound, including Buyer's organizational documents, (c) does not constitute a violation of any law, and (d) does not give any Person the right to challenge any of the transactions contemplated hereby. Buyer has the requisite power and authority to enter into this Agreement and all agreements, instruments and documents executed in connection herewith and to perform its obligations hereunder and thereunder and all corporate action on the part of Buyer, its officers, directors and shareholders necessary for the due authorization, execution, delivery and performance of this Agreement and all agreements, instruments and documents executed in connection herewith to which it is a party has been taken.

5.3     The payments of the Earn-out Payments contemplated herein do not, and will not, violate the terms of, and are not subordinated to, any loan or credit facility to which Buyer or its assets are subject, and Buyer is not subject to any agreement that would prohibit or otherwise restrict the timely payment of the Earn-out Payments pursuant to the terms and conditions of this Agreement.

6.     Closing.  The transactions contemplated hereunder shall be consummated (the "Closing") at the offices of Blank Rome LLP, One Logan Square, Philadelphia, Pennsylvania 19103 on the date hereof (or at such other location as the parties hereto may agree or via the electronic exchange of execution versions of this Agreement and all other agreements, instruments and documents executed in connection herewith and the signature pages thereto via facsimile or via email by .pdf) (the "Closing Date").

7.     Closing Conditions.  Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at Closing is subject to the satisfaction (determined by Buyer, in its reasonable discretion), at or prior to the Closing, of each of the following conditions: (a) Buyer shall have received from Company a Secretary's Certificate with the following attested and certified to: (i) Company's authorizing resolutions regarding the transactions contemplated hereby; (ii) good standing certificates for Company, certified by the Secretaries of State (or other applicable office) in which Company is organized and qualified to do business, dated as of a date not more than ten (10) days prior to the Closing Date; and (iii) Company's organizational documents; (b) Buyer shall have received a Bill of Sale, duly executed by Company, and an Assignment Agreement, duly executed by Company, each in form and substance satisfactory to Buyer; (c) Buyer shall have received such governmental authorizations and third party consents, which shall be in full force and effect on the date hereof, as are necessary or desirable to (i) consummate the transactions contemplated hereby, including the assignment of the Assigned Contracts to Buyer, and (ii) allow Buyer to operate the Assets from and after the Closing Date; (d) John shall have executed and delivered an Employment Agreement with Buyer, in form and substance satisfactory to Buyer; (e) Seller shall have executed and delivered all such documents and performed such acts as Buyer has reasonably requested for Buyer to obtain any tax clearance certificates available to absolve Buyer of successor tax liability; (f) Seller shall have executed a change of name amendment in form and substance satisfactory to Buyer and such other consents, authorizations, notices or certificates as may be required to grant to Buyer the right to use the name "Ingalls" or "Ingalls Engineering" and (g) Buyer shall have received such other agreements, certificates, instruments and documents requested by Buyer, including intellectual property assignments, in order to fully consummate the transactions contemplated by this Agreement and carry out the purposes and intent of this Agreement.

Page 11

Company's obligation to sell the Assets and to take the other actions required to be taken by Company at Closing is subject to the satisfaction (determined by Company, in its reasonable discretion), at or prior to the Closing, of each of the following conditions: (a) Buyer shall have executed a lease with all necessary parties for the Business Premises located at 2011 Cherry Street, Suites 104 and 106, Louisville, Colorado, and Company shall be released from its present lease for that location.

8.       Covenants.

8.1     Post-Closing.  After the Closing Date, (a) Company and John shall cooperate with Buyer in its efforts to continue and maintain for the benefit of Buyer the business relationships of Company existing prior to Closing and relating to the Business or the Assets and not take any action that would tend to diminish the value of the Assets after Closing or that would interfere with the business of Buyer to be engaged after Closing; (b) Company shall cooperate with Buyer to transfer to Buyer the control and enjoyment of the Assets and not take any action to obstruct or impair the smooth assumption by Buyer of the Assets, including, without limitation, all name rights and domain names, (c) Company shall execute and deliver all such further documents or perform such acts as Buyer may reasonably request in order to more fully consummate the transactions contemplated hereby, and (d) Company shall promptly deliver to Buyer all correspondence, papers, documents and other items and materials received by Company found to be in their possession which pertain to the Assets (other than Company's minute books, stock books and related organizational documents).  From and after the Closing Date, if Company or any of its affiliates receives or collects any funds relating to the Assigned Contracts, any accounts receivable of Buyer related to the Assets, Company shall, and shall cause its affiliates to, remit any such amounts to Buyer within ten (10) days of each day on which Company or its affiliate receives such sum.

8.2     Restrictive Covenants.  Company and Shareholder acknowledge that: (a) Buyer's businesses are highly competitive and face competition from numerous and a variety of Persons; (b) Buyer's businesses require substantial and continuous expenditures of time and money to develop, market and maintain; (c) Buyer would not consummate the transactions contemplated hereby without Seller agreeing to be bound by the Restrictive Covenants (as defined below); and (d) the Restrictive Covenants are fair and reasonable in all respects.  Accordingly, before and after the Closing Date and for the Covenant Period (as defined below), Company shall not, and shall cause its then-existing directors, officers, employees, consultants, representatives and agents not to, and Shareholder shall not except with Buyer's express prior written consent, directly or indirectly, whether as an employee, consultant, associate, owner, partner, member, agent, director, manager, officer, shareholder or in any other capacity, for their own account or for the benefit of any Person, with or without compensation: (i) solicit, divert, take away or interfere with any customers, distributors, vendors/suppliers, strategic partners, or prospects of the Business and/or Buyer; (ii) (A) solicit, divert, or induce any Person who is an employee, associate, consultant, agent or representative of the Business and/or Buyer (or any of Buyer's affiliates) to leave or to work for Company or any of the Shareholder or any Person with which Company or Shareholder are connected or affiliated or in any way interfere with the Business' and/or Buyer's relationship with such Person or (B) hire any Person any Person who is an employee, associate, consultant, agent or representative of the Business and/or Buyer (or any of Buyer's affiliates); (iii) establish, own, manage, operate, finance or control, or participate in the establishment, ownership, management, operation, financing or control of, or be a director, manager, officer, employee, associate, consultant, agent, representative or independent contractor in a business in competition with, or similar to, all or any part of the Business and/or Buyer; or (iv) disparage Buyer or any of Buyer's stockholders, directors, officers, managers, members, partners, employees, representatives or agents (collectively, the "Restrictive Covenants"); provided, however, that nothing in this Section 7.2 shall prevent Shareholder from owning not more than five percent (5%) of the outstanding securities of any Person whose securities are listed on any national securities exchange.  The "Covenant Period" means a period of five (5) years after the date hereof.

**8.2.1** <u>Rights and Remedies Upon Breach</u>. If Company or Shareholder breaches or threatens to commit a breach of any of the Restrictive Covenants, Buyer shall have the following rights and remedies, each of which rights and remedies shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to Buyer under law or in equity: (a) the right and remedy to have the Restrictive Covenants specifically enforced (without posting any bond) by any court having equity jurisdiction, including the right to any entry against Company or Shareholder for restraining orders and injunctions (preliminary, mandatory, temporary and permanent) against violations, threatened or actual, and whether or not then continuing, of such covenants, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to Buyer and that money damages alone will not provide adequate remedy to Buyer; and (b) the right and remedy to require Company and Shareholder to account for and pay over to Buyer all compensation, profits, monies, accruals, increments or other benefits derived or received by Company and Shareholder as a result of any transactions constituting a breach of any of the Restrictive Covenants.

**8.2.2** <u>Severability of Covenants; Enforceability</u>. If any court determines that any of the Restrictive Covenants, or any part thereof, is invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect, without regard to the invalid portions. If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provisions and, in its reduced form, such provision shall then be enforceable and shall be enforced. Buyer and Seller intend to and hereby confer jurisdiction to enforce the Restrictive Covenants upon the courts of any jurisdiction within the geographical scope of the Restrictive Covenants. If the courts of any one or more of such jurisdictions hold the Restrictive Covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of Buyer and Seller that such determination not bar or in any way affect Buyer's right to the relief provided above in the courts of any other jurisdiction within the geographical scope of such Restrictive Covenants, as to the breaches of such Restrictive Covenants in such other respective jurisdictions, such Restrictive Covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

**8.3** <u>Employment</u>. Commencing on the Closing Date, Company shall terminate all employees of the Business and Buyer shall offer employment effective on the Closing Date to all employees of the Business on an "at will" basis. Company shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, manager, member, director, independent contractor or consultant of the Business, including hourly pay, commission, bonus, salary, accrued vacation and sick time, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Company at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date. Company shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, members, managers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date. Company also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which claims relate to events occurring on or prior to the Closing Date.

**8.4** <u>Name</u>. Company shall (and Shareholder shall cause the Company to), within ten (10) days of Closing, amend its Articles of Organization and other organizational documents and take all other actions necessary to change the Company's name to one sufficiently dissimilar to "Ingalls" and "Ingalls Engineering", in the sole discretion of Buyer, to avoid confusion.

Page 13

8.5    Publicity; Disclosure.   No publicity release or announcement or any other disclosure concerning this Agreement or the transactions contemplated hereby shall be issued or provided by Seller (before or after the Closing) without the written approval of Buyer. Seller shall keep the terms of this Agreement confidential, except as may be required by law. Seller shall not, before or after the Closing, disclose or communicate to any Person, or use for the benefit of any Person, any secret, confidential or proprietary knowledge or information with respect to Buyer, the Business, the Assets and/or Company.

9.    Indemnification.   From and after the date hereof, Company and Shareholder shall, jointly and severally, indemnify, defend and hold harmless Buyer and its affiliates and agents, representatives, members, managers, partners, officers, directors and stockholders (collectively, the "Buyer Group") from and against losses, liabilities, costs and expenses (including attorneys' fees and costs) ("Losses") arising from (a) any breach of any representation, warranty, covenant or agreement contained herein and/or in any document or agreement contemplated hereunder; (b) any Colorado law relating to the sale of assets in bulk; (c) the ownership or operation of the Business and/or the Assets prior to the Closing; (d) the failure of Company to pay, perform and discharge in full the debts, liabilities, obligations and responsibilities of any kind whatsoever of Company relating to the Business and/or relating to the Assets, whether direct, indirect, recorded, unrecorded, accrued, absolute, contingent or otherwise, known or unknown, whether due or to become due, except the Assumed Liabilities; and/or (e) any Proceedings or Orders relating to the foregoing.

From and after the date hereof, Buyer shall indemnify, defend and hold harmless Company and its affiliates and agents, representatives, members, managers, partners, officers, directors and stockholders (collectively, the "Company Group") from and against Losses arising from (a) any breach of any representation, warranty, covenant or agreement of Buyer contained herein and/or in any document or agreement contemplated hereunder; (b) the failure of Buyer to pay, perform and discharge in full the debts, liabilities, obligations and responsibilities of any Assumed Liabilities; and/or (c) any Proceedings or Orders relating to the foregoing.

In the event a Party seeks indemnification recovery under this Section 9 (the "Indemnified Party"), it shall, within a reasonable time, not to exceed thirty (30) days from and after becoming aware of the claim, give to the other Party (the "Indemnifying Party") a written notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claims for recovery under this Section 9, to the best of its understanding, and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any agreement, certificate or instrument executed pursuant hereto or in connection herewith upon which such claim is based.

Any Claim Notice in respect of any claim, action at law or suit in equity by a third Person as to which recovery will be sought shall be given promptly after the claim is received or the action or suit is commenced and notice thereof is received by the Indemnified Party, so as to not prejudice defense of the claim. After the Indemnified Party has received such notice of a claim by a Third Party from the Indemnifying Party, the Indemnified Party shall allow the Indemnifying Party an opportunity to undertake the prompt and diligent defense, settlement, or other resolution of the claim. In the event the Indemnifying Party assumes the defense as provided above, the Indemnified Party shall have the right to participate in the defense at its own expense, shall cooperate with the Indemnifying Party in such defense and will attempt to make available to it on a reasonable basis all such witnesses, records, materials, and information in its possession or under its control relating thereto as is reasonably requested by the Indemnifying Party. Without the written consent of the Indemnified Party, the Indemnifying Party shall not, in the defense of such Third Party claim or any Litigation resulting therefrom, consent to the entry of any judgment or enter into any settlement. Any settlement of a Third Party claim shall include, as to the

Page 14

Indemnified Party as an unconditional term thereof, a release by the Third Party of the Indemnified Party from any and all liability in respect of such claim or Litigation, unless the Indemnified Party agrees otherwise in writing. In the event that the Indemnifying Party elects not to assume the defense, is unwilling to acknowledge its indemnification obligations to the Indemnified Party in writing as required by this Section, or does not perform or reasonably appears to be incapable of performing such obligations, then the Indemnified Party may defend, settle, or otherwise resolve the claim as the Indemnified Party determines to be appropriate, without prejudice to its claim for indemnification. In such case, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and attempt to make available to it all such witnesses, records, materials, and information in its possession or under its control relating thereto as is requested by the Indemnified Party.

In addition to the rights to indemnification as aforesaid, the Indemnified Party shall have all of its rights and remedies under law and equity in connection with this Agreement and the transactions contemplated hereunder. In addition to all other rights and remedies that Buyer may have, Buyer shall have the right to setoff against any amounts owed to Company or John pursuant to this Agreement (including any Earn-out Payment) any sums for which Buyer is entitled to indemnification under this Section 9, *provided, however,* that no acceptance by the Company of an earn-out payment reduced by such an indemnification claim setoff shall constitute a waiver by Company of any and all rights to dispute a setoff and/or the claim on which it is based.. Buyer's rights to indemnification under this Section 9 shall not be in any manner limited by or to this right of setoff. Any indemnification payments shall be treated as an adjustment to the Purchase Price.

The Indemnified Party agrees to mitigate Losses to the fullest extent required by law.

Any action based upon an alleged breach of a representation or warranty contained in this Agreement (as distinguished from a breach of a covenant of either party to the other hereunder) shall be brought within twenty four (24) months from and after the Closing or shall be deemed waived. Company and Buyer hereto acknowledge and agree that the only representations and warranties made by either in connection with the transactions contemplated by this Agreement are those that are set forth herein.

In the event a Party (the "Knowing Party"), has actual knowledge on the Closing Date that a representation or warranty made by the other party is incomplete, erroneous, or false, or the other Party has violated a covenant made by it under this Agreement and the Knowing Party proceeds to the Closing notwithstanding such knowledge, the Knowing Party shall be deemed to have waived any rights it may have for indemnification or damages against the other party as a result of such breach of this Agreement.

10.    Binding Agreement. The parties intend for this Agreement to constitute a legally binding agreement enforceable in accordance with its terms.

11.    Specific Performance. Seller recognizes that Buyer will be irreparably injured if this Agreement is not specifically enforced. Therefore, if Seller fails or refuses to perform any of the provisions of this Agreement, monetary damages alone will be inadequate. Buyer shall, therefore, be entitled in such event, in addition to monetary damages, to obtain specific performance of the terms of this Agreement. In any action to enforce the provisions of this Agreement, Seller expressly waives the defense that there is an adequate remedy at law and agrees that Buyer shall have the right to obtain specific performance of the terms of this Agreement.

12.    Expenses. Each party (Buyer, on the one hand, and Shareholder and Company, on the other hand) shall be responsible for its own expenses incurred in negotiating and preparing this Agreement and carrying into effect the transactions contemplated hereby.

13.    <u>Waiver; Entire Agreement; Amendment</u>.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  This Agreement and any other documents, instruments or other writings delivered pursuant to this Agreement constitute the entire agreement among the parties with respect to the subject matter of this Agreement and supersede all prior and contemporaneous agreements, understandings and negotiations, whether written or oral, with respect to the subject matter of this Agreement.  This Agreement shall only be varied, modified, supplemented or terminated in a writing executed by all the parties hereto.

14.    <u>Governing Law; Venue; Mutual Drafting</u>.  This Agreement is made under, and shall be construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law.  The parties hereto consent to the exclusive jurisdiction of the state and federal courts located in the State of Colorado, with respect to all claims and disputes between or among the parties hereto with respect to the subject matter hereof.  The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's-length and among parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement.  Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived.  Seller shall take all actions necessary to comply with any and all requirements under applicable law relating to the sale of assets in bulk or otherwise.

15.    <u>Severability; Assignment; Third Party Beneficiaries</u>.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination will not affect the remaining provisions of this Agreement, all of which will remain in full force and effect.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by each of the parties hereto and their respective heirs, executors, personal representatives, successors and permitted assigns.  This Agreement may not be assigned by Company or Shareholder.  Buyer may assign any or all of its rights, interests and obligations hereunder to any third party, including for collateral security purposes to any lender providing financing to Buyer or its affiliates and any such lender may exercise all of the rights and remedies of Buyer hereunder.  Nothing in this Agreement is intended to confer upon any Person, other than the parties hereto any rights or remedies under or by reason of this Agreement.

16.    <u>Counterparts; Construction; Notice</u>.  This Agreement may be signed in counterparts, including by facsimile or electronic transmission, all of which when taken together shall constitute one and the same agreement.  When used in this Agreement, the words "including" and "include" shall be deemed followed by the words "without limitation".  Any notices given hereunder shall be sent to the respective party's address and to each party's respective attorney's address set forth on the signature pages hereto (or such other address as such party provides notice of pursuant to this Agreement) and shall be deemed given five (5) days after sent by certified mail, return receipt requested or two (2) days after sent by a reputable overnight courier, with receipt, or on the same day if personally hand delivered or sent by electronic transmission, if, in the case of electronic transmission, confirmed within forty eight (48) hours thereafter by a signed original sent by one of the other notice methods provided.  Any notice to be sent to any party hereunder may be sent by such party's attorney.

*-Signatures on Following Page-*

Please acknowledge your acceptance of and agreement to be legally bound by the above terms by signing and returning a copy of this Agreement. Upon due execution and delivery by all parties, the agreements set forth herein shall be the valid and legally binding obligations of each party, effective as of the date first set forth above.

Very truly yours,

RB DISTRIBUTION, INC.

By: _____
Name: David C. Cohen
Title:  Vice President, Business Development
Address: 3400 East Walnut Street
         Colmar, PA 18915

With a copy to:
Blank Rome LLP
130 North 18th Street
Philadelphia, PA 19103
Attention: Linsey B. Bozzelli
Email: Bozzelli@BlankRome.com

ACKNOWLEDGED AND AGREED:

COMPANY:

INGALLS ENGINEERING COMPANY, INC.

By: _____
   Name: John O'Rourke
   Title:  President

Address:    2011 Cherry Street, #104
            Louisville, CO 80027

With a copy to:

Thomas C. Volkmann
Spiecker, Hanlon, Gormley & Volkmann LLP
225 North 5th Street, Suite 602
Grand Junction, CO 81501

SHAREHOLDER:

John E. O' Rourke

By: _____
Address:    8688 Portico Lane
            Longmont, CO 80503

*Signature Page to Letter Purchase Agreement*