IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 20-cv-02456-NYW-KLM

OREO VENTURES, INC., formerly known as Ingalls Engineering Company, Incorporated,

    Plaintiff,

v.

RB DISTRIBUTION, INC.,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant RB Distribution, Inc.'s ("RB" or "Defendant") Motion for Summary Judgment ("Motion for Summary Judgment" or "Motion"). [Doc. 47, filed September 17, 2021]. Plaintiff Oreo Ventures, Inc. ("Oreo Ventures" or "Plaintiff") timely filed its Response [Doc. 52, filed October 8, 2021], and Defendant did the same with its Reply, [Doc. 55, filed October 22, 2021]. The issues presented in Defendant's Motion are ripe for resolution. For the reasons set forth below, the Court respectfully **DENIES** Defendant's Motion for Summary Judgment.

## BACKGROUND

The following undisputed facts are drawn from the record before the Court. Plaintiff Oreo Ventures, Inc., formerly known as Ingalls Engineering Company, Incorporated ("Ingalls") designed, engineered, and produced premium quality chassis, steering, suspension, and alignment components in the automotive aftermarket and original equipment manufacturer replacement segments. [Doc. 70 at 6, ¶ 12]. RB is an affiliate of Dorman Products, Inc. ("Dorman"), a leading supplier in the automotive aftermarket. [*Id.* at ¶ 14]. On January 5, 2017, Defendant and Plaintiff

executed an Asset Purchase Agreement (the "Agreement") in which Defendant acquired Plaintiff's interest in inventory and equipment relating to Plaintiff's "small box chassis line." [Doc. 48-8 at 2]. That Agreement is central to the instant dispute. *See generally* [*id.*]. One section—Section 3.2—is particularly relevant here. [*Id.* at 4]. In full, the provision provides for a set of earn-out payments from the buyer to the seller; that is, payments permitting a seller to receive compensation for future earnings or financial goals. [*Id.*]. The earn-out provision was a central part of the Parties' contractual obligations, and was specifically noted in Section 3.1 of the Agreement as consideration for the sale. [*Id.*]. Section 3.2, which goes on to detail the earn-out structure, contains a clause that is of significant relevance to this dispute:

> (d) "Net Sales" shall mean the gross sales attributable to *the* small box chassis product line sold by Buyer and any affiliate from *and* after Closing (*the* "Chassis Product Line"), less all adjustments, including discounts, allowances, rebates and product lifts for *the* Chassis Product Line . . . .

[*Id.* (emphasis added)].

This case was originally filed in the Colorado District Court for Boulder County on February 10, 2020, and raised just one claim for declaratory relief. [Doc. 1 at 2-6]. That remains Plaintiff's only cause of action. *See* [Doc. 40 at 1]. On August 14, 2020, Defendant removed the instant action to the United States District Court for the District of Colorado. [Doc. 1 at 1-10]. On August 4, 2022, the case was reassigned from Judge Raymond P. Moore to this Court. [Doc. 77]. It is with this factual and procedural background in mind that the Court turns to a consideration of the legal standards that will govern the Motion's resolution.

**LEGAL STANDARD**

I.  **Summary Judgment Standard**

The Court may grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put differently, the Court's function at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Of course, the bar on weighing evidence does not absolve a nonmoving party from the need to offer some "concrete evidence from which a reasonable juror could return a verdict" in his or her favor. *Anderson*, 477 U.S. at 256. Such a showing must consist of more than a "scintilla of evidence." *Id.* at 252. That is, conclusory statements based on speculation, conjecture, or subjective belief are insufficient to survive summary judgment. *See Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

Whether a fact is "material" depends on whether it pertains to an element of a claim or a defense; a dispute is "genuine" if the evidence is so contradictory that a reasonable jury could return a verdict for either party. *See Anderson*, 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). In reviewing a motion for summary judgment, this Court views all evidence in the light most favorable to the non-moving party. *See, e.g., Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002). That said, the Court is not bound to make unreasonable inferences in favor of that party.

3

*Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008). It is this legal framework that will control the Court's consideration of the pending Motion.

**II.      Governing Law**

The Parties agree that Pennsylvania law governs the Court's interpretation of the Agreement.[1] [Doc. 47 at 10-12; Doc. 52 at 3-4]. That follows from the Agreement's unambiguous choice-of-law terms, which provide that "[t]his Agreement is made under, and shall be construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania." [Doc. 48-8 at 16]. As such, the Court will employ Pennsylvania law in conducting its analysis. *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption."); *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1017 (10th Cir. 2018), *as revised* (Apr. 13, 2018).

**ANALYSIS**

The Parties advance several arguments in support of their respective positions, but—as Defendant itself notes—this is an "earn-out dispute" that depends on the interpretation of the earn-out provision included in Section 3.2 of the Agreement. [Doc. 47 at 5]. Each Party contends that the unambiguous meaning of the contract entitles it to relief.[2] It follows that the Court's analysis proceeds in two parts: first, determining whether or not the Agreement's provision at issue is ambiguous, and second, determining whether any extrinsic evidence available at this point resolves

---

[1] Plaintiff suggests that Pennsylvania contract law is "effectively identical to that of Colorado." [Doc. 52 at 4]. The Court does not consider that argument—or apply Colorado law—given Plaintiff's agreement that Pennsylvania law governs.

[2] While Plaintiff contends that "[a] common sense and logical reading of the relevant earnout provisions in the Agreement would entitle Plaintiff to summary judgment on its declaratory relief claim," [Doc. 52 at 14], it did not move for summary judgment and cannot do so in a Response. D.C.COLO.LCiv R. 7.1(d).

that ambiguity in favor of Defendant. The answer to the first question is yes, and the answer to the second is no.

I. Ambiguity

As referenced above, the Court and the Parties view this Motion as turning on portions of Section 3.2 of the Agreement. Specifically, the Parties focus on the definition of "Net Sales" in their briefs. [Doc. 47 at 17; Doc. 52 at 7]. That definition is, in full:

> (d) "Net Sales" shall mean the gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after Closing (the "Chassis Product Line"), less all adjustments, including discounts, allowances, rebates and product lifts for the Chassis Product Line, *provided, however,* that Net Sales shall not include any control arms, and shall not include any sales to AutoZone of products that are a part of the Chassis Product Line that are sold by Buyer or any affiliate of Buyer to AutoZone on the date hereof (such products, "Overlapping Products"). For the avoidance of doubt, a product shall be deemed to be an Overlapping Product if its part number (or successor part number) is the same as a part number (or successor part number) for a product that is sold by the Company to AutoZone immediately prior to Closing.

[Doc. 48-8 at 3 (emphasis in original)].

***From and After.*** Defendant argues that two words are particularly relevant to the Court's interpretation: "and" and "the." First, Defendant argues that the dictionary definition of "and" is limited to a conjunctive, meaning that "Net Sales" continuing after the execution of the Agreement must also have must have existed as of the date of the Agreement's execution. While it acknowledges that the term may be read in this manner, this Court respectfully disagrees that "from and after" is unambiguously limited to such meaning. "From and after," as used in Section 3.2.1, may be read as including gross sales attributable to the small box chassis product line including *both* sales made as of the date of the Agreement's execution and those made after. Pennsylvania precedent reflects the same:

> We shall resist the temptation to indulge in a profitless exercise in ancient and sterile dialectics. The difference between disjunctive and conjunctive pleading is

5

> mostly the difference between tweedledum and tweedledee, and modern jurisprudence, which appraises substance and not form as its essence, accords to such useless learning only a nodding acquaintance.

*Commonwealth v. Schuler*, 43 A.2d 646, 443 (Pa. Super. Ct. 1945). The Court is mindful of the Agreement's text, and will not rewrite any single provision to suit a particular party's interpretation.

The same is true for the inclusion of "from and after" in other portions of the Agreement. Defendant relies on the use of "from and after" in other provisions, specifically citing to Section 7. [Doc. 47 at 15-16]. But the phrase "from and after" also appears in Sections 8 and 9 of the Agreement. [Doc. 48-8 at 12-15]. Defendant is correct that Pennsylvania law suggests that contracts are to be interpreted holistically. *See, e.g.*, *Binswanger of Pa., Inc. v. TSG Real Estate LLC*, 217 A.3d 256, 262 (Pa. 2019) ("[T]he entire agreement must be taken into account in determining contractual intent."). Where a single term is ambiguous, and thus impossible to construe by a court without trial proceedings and witness testimony, its inclusion in other locations in a contract is not dispositive and may require extrinsic evidence to define. *See Ferrer v. Trustees of the Univ. of Pa.*, 825 A.2d 591, 608 (Pa. 2002) ("Only where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties."). Here, the uses of "from and after" in Section 7, vis-à-vis "Assets," and Section 8, vis-à-vis "Assigned Contracts," are not used to define the scope of a particular term; rather "Assets" are specifically set forth in Schedule 4.2 and "Assigned Contracts" are specifically set forth in Schedule 1. [Doc. 48-8 at 2]. Thus, as used in Sections 7 and 8, this Court finds "from and after" does not support the conclusion that "from and after" unambiguously limits Oreo Ventures's liability under "Net Sales" in Section 3.2 to sales on products made after the Closing Date to only products that existed as of the Closing Date. In addition, as used in Section 9, "from and after" does not necessarily

6

support RB's interpretation; indeed, it would seem counter-intuitive that RB would argue that it is only entitled to indemnity for any losses, liabilities, costs and expenses occurring after the Closing Date that also existed at the time of the Closing Date—thereby excluding any losses that did not exist as of the Closing Date but arose afterwards.  *See* [Doc. 48-8 at 14].

***The.***  "The"—that is, "*the* small box chassis product line"—poses a separate question. Defendant argues that "the" limits the product line at issue to a specific, definable set of products sold by Plaintiff at a particular time.  Defendant contends that, had the Parties intended to expand the scope of the product line to future acquisitions or future products, that they would have used more indefinite articles such as "any," "all," or even "a."  [Doc. 47 at 17; Doc. 55 at 8].  But "the" is not as limited as Defendant suggests.  A product line of any item may be "the" product line of that item at a given point, but that product line may expand or contract over time.

As Plaintiff argues, the use of the article "the" does not specifically exclude a particular subset of sales, in contrast to the use of the terms "control arms" and "any sales to AutoZone . . . on the date hereof."  [Doc. 48 at 4].  The Agreement uses broad language: "the gross sales attributable to the small box chassis product line sold by Buyer and any affiliate from and after Closing."  [Doc. 48-8 at 4].  The fact that certain specific categories of sales were singled out for exclusion suggests that other sales were—at least arguably—intended to be included in the earn-out provision.  *E.g.*, *Empire Sanitary Landfill, Inc. v. Riverside Sch. Dist.*, 739 A.2d 651, 655 (Pa. Commw. Ct. 1999) ("[F]or the purposes of determining the intent of parties to a contract, the maxim *expressio unius est exclusio alterius* is applicable," which "translates into the proposition that the mention of particular items implies the purposeful exclusion of other items of the same general character." (internal citations and quotation marks omitted)).

7

Nor is this Court persuaded that Oreo Ventures's interpretation of Section 3.2 is unambiguous and correct. As discussed above, the Court concludes that the Agreement is ambiguous as to the specific meaning of "Net Sales," and in particular, "from and after" and "the" in Section 3.2.1. The Court next turns to a consideration of whether any other evidence adduced by Defendant could resolve that issue at summary judgment.

## II.    Extrinsic Evidence

Defendant contends that extrinsic evidence supports its construction of the Agreement. It points to the course of the parties' negotiations—specifically, to note that RB Distribution "was clear that any earn-out component of a deal would be limited to the small box chassis product line that existed within Ingalls or its own product portfolio." [Doc. 47 at 22-23]. Plaintiff similarly asserts that the extrinsic evidence reveals that "Net Sales" includes "all [] sales of small box chassis products by RB and its affiliates, regardless of the basis on which it came to sell them, including without limitations, those which may have resulted from acquisitions from other entities, and changed or new products or brands, since the Closing on January 5, 2017." [Doc. 52 at 14].

The evidence presented to the Court at this stage comes in two main categories: deposition testimony and drafts of the Agreement. With respect to deposition testimony, both Parties reference John O'Rourke's ("Mr. O'Rourke") deposition. Defendant notes that he testified—as both an individual and as a Rule 30(b)(6) designee for Plaintiff—that Plaintiff understood that "the definition of Net Sales included sales from later acquired businesses." [Doc. 47 at 13]; *see also* [Doc. 52 at 7 (noting that "Mr. O'Rourke testified in some detail on [the] topic" of the Chassis Product Line's definition)]. In short, Mr. O'Rourke's deposition testimony is evidence that a material fact, *i.e.*, the mutual understanding of the Agreement, is not undisputed.

8

Second, the Parties rely on drafts of the Agreement to make their respective points. Once again, there exists a dispute of material fact. Plaintiff points to the fact that a number of suggested changes were *not* adopted in the final Agreement. [Doc. 52 at 11]. For example, Plaintiff notes that Defendant proposed defining "'Net Sales' and 'Incremental Growth in Net Sales' for the purposes of calculating the earn-out to be based solely upon sales of the 'Business.'" [*Id.* at 12]. Oreo Ventures argues that the failure to agree upon those terms militates against Defendant's interpretation of "Net Sales." Defendant, on the other hand, argues that the "earlier iterations of the [Agreement] demonstrate that the parties' shared intent was never to include later-acquired companies in any calculations of potential Earn-out payments to Plaintiff." [Doc. 55 at 17]. The issue of the Parties' intent is important, as Pennsylvania law makes abundantly clear. *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (2001) ("The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties."). But the dispute over that intent, as reflected in the draft agreements, is not suitable for summary judgment and may only be resolved with the benefit of witness testimony at trial.

Based on the record before it, and drawing all factual inferences in favor of the non-moving party, the Court cannot conclude that there is a lack of any genuine issue of material fact that would permit a grant of summary judgment to Defendant. As such, the Court respectfully **DENIES** the Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1) Defendant's Motion for Summary Judgment [Doc. 47] is **DENIED**;

(2) The Final Trial Preparation Conference **REMAINS SET** for September 23, 2022 at 10:00 a.m. before Judge Nina Y. Wang in Courtroom A-502 of the Alfred A. Arraj

United States Courthouse, and Final Pretrial Orders remain due by September 16, 2022;

(3) The trial **REMAINS SET** to commence on October 25, 2022 at 9:00 a.m.; and

(4) The deadlines laid out in Judge Raymond P. Moore's Order Setting Case for Trial [Doc. 74] **REMAIN SET**. As this case has since been reassigned to this Court, Parties should send email communications to Wang_Chambers@cod.uscourts.gov.

DATED:  September 13, 2022               BY THE COURT:

_____
Nina Y. Wang
United States District Judge